Our case this morning is 413-1114, People v. Little. For the appellant is Fred Johnson. You are here, sir, for the appellate, Mr. McNeil. Mr. Johnson, you may proceed. Thank you, Your Honor. May it please the Court, as you indicated, my name is Fred Johnson. I represent the defendant, Timothy Little. I will address the issues on review in the order I took them up in my brief. The first issue is whether the evidence was sufficient for a rational prior effect to find all the elements of the offense were proved beyond a reasonable doubt. Simply stated, the elements of the offense of stalking as charged were that the defendant knowingly, on two occasions, committed two acts directed at a specific person and knew his conduct would cause a reasonable person to suffer emotional distress. The two acts involved here were the threatening of his wife, Sarah, with a gun, which admittedly would cause emotional distress. The second element is problematic, and that is that he traveled past the woman's shelter at a time when he did not, according to the unrebutted evidence, know that it was a woman's shelter, did not know Sarah had gone to Best Place. Best Place did not have a sign, according to the record, no evidence of a sign that it was a woman's shelter. Sarah had affirmatively told her husband not that she's going to Best Place or any woman's shelter, but rather going to a store. Counsel, did the jury have to believe that testimony from your client? They don't have to believe that testimony, but there has to be some evidence, Your Honor, that the jury could reasonably infer that his wife was where she was. Because otherwise, any time a person commits an act, admittedly, of threatening his wife with a gun, and his spouse happens to travel to a building somewhere else in another town, and he coincidentally travels there, not knowing his wife will be there, doesn't stop, circle, go in, or surveil, but continues on by, he would be at risk if that is the analysis of being convicted of a class 4 felony. But we had the testimony of the woman who worked at the shelter that he didn't just drive by, he slowed down at least enough to cause her to notice him and made eye contact, correct? That's true, but that's still insufficient for this reason. There was no evidence that as he was approaching the woman's shelter, he slowed down any more so than he had been driving already. It was merely that when he drove by, he drove by at a slow or very slow rate of speed, but no indication that as he approached, he slowed down further than what he had been driving, and as he departed that area where the woman's shelter was, he continued to drive slowly until he got to Ohio Street where there was more traffic and at that point sped up. But aren't you asking us to basically second guess the jury? Didn't they have the right to basically determine the credibility of the evidence, and is there anything improper with them saying, well, we know she was there, they had had this argument, he ended up there, he slowed down to whatever extent was explained in the evidence, and we choose to believe that he knew she was in there and that he was surveilling her? I would respectfully disagree because the inference the jury is permitted to draw must be reasonable inferences, not coincidences that could happen to any person driving by anywhere where his spouse might happen to be. And in this particular case, there is nothing that the jury had to base a reasonable inference upon that his wife Sarah was going to be at that time when he was going to check on his trucks. Even if they didn't believe what Mr. Little said, there has to be some affirmative evidence to present to the jury that they reasonably conclude Sarah was there and Tim knew she would be there. Otherwise, it's almost a strict liability offense that when you drive by any building where your wife might happen to be after a heated argument, that you could be at risk of being convicted if the jury just Does the record show how old your client is? How old he is? I wasn't anticipating that question. Does the record show how long? It might be in the petition for dissolution of marriage that was entered into evidence. Does the record show how long he had lived in Tuscola? He actually lived in Villa Grove. Okay. And so? He was a lifelong resident of Villa Grove and going to check on his trucks, which were outside of Tuscola. Well, how might that be significant in playing into inferences that the jury could draw? I'm talking about someone who's driving around a metropolitan area like Chicago. We're talking about Oracle County. We're talking about Douglas County, a relatively small place. Right. And for an adult man who's lived there his whole life, it seems to me it would be a lot easier inference for a jury to draw that he would know what Beth's place was and where it would be located than if he were driving around Palatine, Illinois, and somehow got into the city of Chicago, where imputing him with any knowledge might be a lot harder. Well, my answer to that, Your Honor, is this. If Beth's place had a sign posted, we are Beth's place. Or it's a woman's shelter. Or something that would put a person on notice who testified on his oath that he did not know what it was, that might be different. Sure enough, if I drive by a B&E grocery store in a small town, it's got its name. But this is a place where there was no evidence it had a name or a posting. It's a woman's shelter. I would suspect, without knowing. I think the point of Justice Steigman's question is, based on my own experiences, I grew up in a town about the size of Tuscola. And a town that size, people just know what things are and where they are. I mean, it's a small town. That's the point of it. People might know where others live. Well, that's Tim Smith's house, and there's no sign in front of that house either. It says, Tim Smith lives here. But it's a small town, and if you are an adult living in that community... But you didn't live in that community. Well, Douglas County, and he's got business in Tuscola. I mean, we're not talking about a place that... Well, let's take that... And, you see, we're talking about a jury of his peers from Douglas County. These are all folks who live in that county as well. That's how they have to be selected. Why can't the jury, as they're told... You may consider common experiences in life, they're told in IPI 101. Why isn't this something... There might be more force to the argument if the state established how long Best Place had been there. If this a new establishment, had it been there six months, a year, two months... There's nothing in the record, to my recollection, as to how long Best Place had been there. Now, if it's the First Methodist Church that's been there for a century, well, sure enough. Or if it is a school or something that's well known. But the state failed to offer other elements of proof to put a reasonable person on notice that they should be aware that this is a woman's shelter. If we don't have anything in the record, how long it's been there. So your position is that it's just bad luck, one, he happened to be driving by that very place at a time where it could be viewed as potentially stalking his wife, who had gone there for refuge. And two, that in the view of the person who was running it, he appeared to be slowing down and looking in. That's just bad luck in his part? Could it happen to anyone? It's more than just bad luck, because it's not that he slowed down. It was he was driving by slowly. I don't believe the record indicated he slowed down from the speed he had been traveling before he came to Best Place in a precipitous, the atmosphere was rainy or misty. It had frozen the night before. It was really cold outside. And my recollection of the record is he drove by slower, very slowly. Not that he slowed down, but just was driving by slowly, did not alter his speed. The executive director, Sharon Jarboe, noticed it sufficiently that it caused her to specifically note this car, his driving of it, and come out and take a closer look at it. Isn't that true? Well, she did. She observed the car driving at a slow rate of speed in adverse weather conditions, all of which was not normal. It's not normal that she would be out there in these conditions and traveling. And she said once he drove by, then he sped up. Not right away. It was when he got further down to Ohio Street. Well, and what accounts for that? Well, she also said there was more traffic there. When he merged in with greater traffic, he sped up. So that's a third bit of bad luck, that there happened to be more traffic later, and accounts for why he would be driving differently as he drove by Best Place. Well, you call it bad luck. I would say these are all inferences that are being drawn beyond the point that is reasonable to convict beyond a reasonable doubt. And measuring this with a view toward the evidence favorable toward the state, it is still insufficient with those coincidences that he's within a 35-mile-an-hour residential speed limit, driving slowly in freezing-type rain conditions, and happens to gaze upon a woman with a dumpster tarping and removing debris, which, in my opinion, would be something that would draw the attention of most any passing motorist under those conditions. So I think what it gets down to is how far can we draw inferences when the state had an opportunity to present the basis for those inference and did not do so. How long was the shelter there? How fast or slow is slow? Is it 1 or 2 miles an hour? Is it 5? Is it 20 miles an hour? It's undefined. And no evidence that he slowed down further from what he had been traveling. So what we have is no evidence that he knew she was there, no history of her traveling there before that would be noticed to her husband. She affirmatively says she's going somewhere else, and no direct testimony that he wasn't checking on his trucks, which, undisputed, were west of Tuscola, a community he did not live in, albeit it is a small community, a small county population-wise. But that doesn't mean everybody in the county is deemed to know where the woman's shelter in those counties happened to be located, especially when we don't know how long they had been there. On the second issue we presented for review, that is to say the jury instructions, the argument I'd like to focus on is the failure to define the term emotional distress. This is a non-IPI instruction. The state tendered its set of instructions. I tendered. Well, by the way, I meant to ask, when you say it's non-IPI instruction, is it correct to say that IPI contains no updated instructions since the statute was amended? On this particular statute. Since the, what is it, section 12-7.3, is that that? Exactly, under this particular subsection. And there are no IPI instructions. When was the statute amended, do you recall? The statute, I have it in front of me. And the 2012 Amendment, Public Act 97-1109, effective January 1, 2013. It says it made no changes. 2011 Amendment, Public Act 97-311, effective August 11, 2011, added section D-10. Well, at some point, though, they restructured this section and we don't have any IPI instructions? That was my recollection. I had the IPI there. Okay. I'm sorry, Counselor, you may go ahead. That's fine. The point I'm making here is now we're dealing with the de novo review of what the law is and whether I did or did not adequately preserve the record. I'm asking the court if I did not to look at this as plain error. I'm not going to go through what that is. The panel knows what that is. But this denied my client a fair trial by failing to tell the jury the statutory definition of what level of emotional distress is required to convict a man of a Class IV felony. Isn't this an argument, though, that would have greater impact if the statutory definition that you claim should have been given in a case like this, in fact, was different than what people who, as I like to put it, English is my mother tongue. I know what emotional distress is, I think. And, you know, if I didn't get a definition, I'd look in the statute, but I'd think, well, yeah, sure, that's it. And that's a fair question, and that's what the State is asking you to rely on to affirm the conviction. The problem, as a common sense matter that I have with that argument, is emotional distress, we all understand what it is, but what level of emotional distress is required for a conviction. I can have emotional distress if I get a phone call from, you know, a telemarketer during my dinner hour. It distresses me that I did so, as we all do. That's insignificant or not very serious emotional distress. But, counsel, aren't we looking at what causes a reasonable person emotional distress? Absolutely, but it's the level of distress that is important, and that's why the legislature, in my humble opinion, saw fit to define it as significant emotional distress, more specifically significant mental suffering, anxiety, or alarm. And so we all know, as human beings, what the word emotional distress means, but the legislature emphasized in this definition, otherwise it's meaningless, is how significant does that distress have to rise to convict a person of this felony. If the distress is not significant, but nonetheless emotional distress, a person like my client could be found guilty. Now, Sarah testified how this affected her, but the jury obviously did not believe a lot of what Sarah had to say because he was acquitted on every other charge. And that largely changed on her testimony. So just how serious did this second-hand information communicated by Jarbo to Sarah emotionally distress her? Was it something that was fleeting? Well, I wish Tim hadn't done that, but let's get on with business. Or was it more serious? That's a factual determination for a jury to make, and the jury was given no guidance as to the level of distress required to find the defendant guilty of that offense, and I find that to be very significant. And it's an oversight in the instructions. It wasn't tendered by me, the state, or the judge. And otherwise, why bother to have it in the statute? It's meaningless. But isn't the focus, when you talk about the effect upon her, I'm just wondering if, by its very language, that's really not an issue here of the statute. The statute, as Justice Holder White talks about, is whether it focuses on the conduct and its effect upon a hypothetical, reasonable person. So that you might have some stoic who said, he was bothersome, but I wasn't really distressed. That wouldn't be essentially a defense if the jury would say, well, this was outrageous behavior. This guy were not such a stoic. Other people, a reasonable person, would have found this to be emotional distress. And the other thing is, would it be conduct that would cause a reasonable person to suffer emotional distress? Not that it'd succeed, but would it cause someone to do that? I understand what you're saying. And why wouldn't that be something that, therefore, we don't need to define as to how did it work in her particular case? Well, let's take it from that point of view, from the hypothetical as opposed to Justice Steigman. And so we're dealing now in a construct with a hypothetical victim. The act that is at question here is driving by slowly, not stopping, not surveilling. And there's a lot of people would view that potentially as emotional distress of insignificant consequence, but emotional distress nonetheless. Well, counsel, can you leave out the fact that previously a gun had been brandished? And, you know, can we leave all of that out? Or does that come into play as well? That comes into play on the first prong of what the state presented. And I'm not arguing that the state didn't have evidence on the first prong. But I'm saying that when we look at a reasonable person standard, do we have to consider all the circumstances under which that reasonable person found themselves in? Well, let's assume that to be the case in answer to your question. Nonetheless, this is basically innocuous conduct of driving by slowly on a rainy day and proceeding on. If he had stopped, if he had done more, it would be different. But what occurred in this case, the jury should have been required to acknowledge and to apply the standard of significant emotional distress. Not any, not minor, not emotional distress that did not rise to the level of significant emotional distress as defined in the statute. Why bother to use the word significant if any emotional stress will do? Just any old emotional distress, fine. You had some momentary fleeting concern that lasted ten seconds and didn't pay any more heed to it. That's for a jury to determine if they believe Sarah or the hypothetical construct. And in my view of the matter, the legislature put that language in there for a purpose to let it be known that the distress must be, as it said, significant mental suffering, anxiety, or alarm. And so I believe that should have been incorporated. Your time is up, but you'll have an opportunity, Mr. Johnson, to address this again remotely. Thank you, Your Honor. Sure. Mr. McNeil? Yes, sir. May I please report? Yes, sir. Counsel? The defendant wants to argue that it was a string of coincidences here, but we have to take into account that the witness outside, she did testify that the defendant was going at least slow enough for her to notice, enough for her to look at the driver, which she realized that he was staring at her the whole time as he was going by Beth's place. Then she testified that the defendant sped up enough that she noticed he sped up after he had passed Beth's place. Taking this into account with Ms. Little's testimony, the defendant didn't know where she was going. He needed chewing tobacco. She said she would go get it at the gas station. In the defendant's mind, he had no idea she was going to this place. This makes it even more of a coincidence that he somehow was driving slowly by. My recollection of the record is that the witness stated it was cold and rainy. I don't think she mentioned anything about ice. I could be mistaken, but I think her testimony was that it was cold and rainy, maybe misty. Again, you do have to take into account that multiple times at the house, the defendant threatened Ms. Little's life while holding a gun. This scared her enough to lie about where she was going and go to this women's shelter. At the women's shelter, him driving by slowly scared the witness enough to put the place on lockdown. So this was not just a normal someone driving in adverse weather conditions. This was enough to put the whole women's shelter on lockdown. In doing that, Ms. Little herself was informed about the defendant driving by. Her specific testimony was the defendant driving by, she thought he was coming there to kill her, which is a reasonable feeling for someone in her position to make at that point. And this was not very long, she was not at the shelter very long before the defendant drove by. The reasonable inference to make from that is that he clearly followed her. He didn't have any idea where she was going. He thought she was going to the gas station. So it was reasonable for the jury to infer that he followed her there. This course of conduct clearly led to emotional distress under any definition. So looking at the evidence and the like, most favorable to the prosecution, there is clearly sufficient evidence. Was there any discussion at trial about giving the emotional distress language? There was not, it would have been the trial court on its own motion. So neither the prosecutor nor the defense counsel raised that? Not that I can recollect. It would have been Sua Sponte as well as the argued statutory exemption for the free speech or right to assemble. That was the main point of contention in the defendant's brief. That's section 12.73-D2. 12-7.3-D2. The section does not apply to an exercise of the right to free speech or assembly that is otherwise lawful. That's important to two of the defendant's arguments. The first being that there was just nothing in the record to support this. The defendant's theory at trial was that he didn't even knowingly drive by this place. He didn't even know it was there to drive by. How that would be an exercise of your First Amendment rights would be too big of a leap to make to provide that instruction. Especially when the court would have to do with Sua Sponte. It was clearly forfeited and the evidence didn't support it. Emotional distress, Justice Holder White nailed it with her question. It's what a reasonable person would think emotional distress is. You can't look at it in a vacuum, especially in this case when the victim's life was threatened multiple times while the defendant was holding a gun. And again, how serious did this information distress Ms. Little? That was a point the counsel was trying to make. Specifically, a lie. Ms. Little testified that she thought the defendant followed her there to kill her. Again, that's not an outlandish inference to make from the facts. She lied about where she was going. The defendant had no reason to believe that she was there. I'll touch briefly on the constitutionality of the stalking statute. The overbreadth doctrine clearly doesn't apply here. I mentioned the statutory exemption. People v. Clark cited in both mine and the defendant's briefs states, A law may be invalidated as overbroad if a substantial number of its applications are unconstitutional. The reason for that, the U.S. Supreme Court provided the remedy out of concern that the threat of enforcement of an overbroad law may deter or kill constitutionally protected speech. This exact language is taken care of in the statute itself here. The section B-2 of the statute clearly exempts any exercise of free speech or assembly that's otherwise lawful in the stalking statute. So not only are there not a substantial number of applications, there aren't any. You don't even have to look outside of the statute here. So the overbreadth doctrine and Clark are clearly inapplicable. Again, assuming the overbreadth doctrine did apply, there's still not a substantial number of applications. As Justice Holder White pointed out, it has to be emotional distress from a reasonable person's point of view. The examples provided by the defendant take the example of a teacher who gives a kid bad grades. The parent's upset and angrily confronts the teacher on two occasions. Again, you have to cause emotional distress in a reasonable person in the teacher's position at that time. The definition of emotional distress is significant mental suffering, anxiety, or alarm. That's pretty common knowledge. So this is more than a parent-teacher conference. This is more than talking to the teacher briefly in a classroom or in the principal's office or something like that. All of these have to rise to the level of significant mental suffering in a teacher and it has to be done multiple times. I would submit that if a person causes significant mental suffering in a teacher one time, they should be put on notice that maybe you shouldn't do that again. If they do, then it is a course of conduct and they would be guilty of stalking. It's not an over-broad statute, especially when you look at the plaintiff in this week. I cited in my brief this court in People v. Nakajima, the purpose of the stalking statute is to protect against the fear of violence associated with predatory and uninvited conduct. In enacting the statute, the legislature sought to prevent violent attacks by prohibiting conduct that may precede them. This conduct in this case by the defendant is a pristine example of the conduct the legislature intended to penalize with the stalking statute. So clearly it's constitutional. The last argument was Ms. Little's cross-examination. The trial court took judicial notice of their petition for dissolution of marriage. The defense counsel then wanted to cross-examine Ms. Little about apparently some potential litigation or the possibility of litigation or adversarial financial gain. In the event of a divorce, the trial counsel told the defense counsel that the petition spoke for itself. The counsel then said, okay, that's fine. That's clearly acquiescence of the trial court. At that point, there were no more questions or even an objection about potential litigation or anything like that. Plus, even if it wasn't waived, potential litigation is purely speculative. It's well settled that pending litigation is something that you can bring up as adversarial. But potential litigation, there's still nothing in the record that suggests any specific lawsuit filed by... Well, it's hard to understand how when she testified in this case, Sharon Little, that she wasn't in a seriously adversarial posture. That's exact... I don't... The adversarial point of any financial gain pales in comparison to the adversarial position of a life-threatening situation. I don't think anybody in the jury was not... aware of the adversarial position between the defendant and Ms. Little, judging by the defendant's action in this case, his course of conduct. Also, even if you want to bring in the affidavit that the defendant's divorce lawyer attached to his post-trial motion, this still didn't mention any specific lawsuit. And it clearly didn't mention that even if there was a specific lawsuit, that it existed at the time of Ms. Little's cross-examination, which is the important date of that anyway. So the record clearly establishes that the trial court handled the cross-examination of Ms. Little properly. Okay. Thank you, counsel. Thank you. Mr. Johnson, anything further, sir? Any rebuttal? I'll just be brief, Your Honor. Okay. Time is limited. On the issue of financial gain, financial gain is always a fair subject of cross-examination. And the mere fact that the two of these individuals otherwise have an adversarial relationship between them, one is a criminal defendant and the other is a victim of an alleged crime, doesn't mean it's of no consequence that she can get financial gain out of the outcome of a conviction. Is there any evidence in this record to show that this is something that was being contemplated or being pursued? Yes, there is. And it is by virtue of the fact a dissolution proceeding had been filed. And by filing a dissolution proceeding, not only asking for maintenance but an allocation of property, the issue of allocation of marital and non-marital property was before the court. And that includes a cause of action for the intentional infliction of emotional distress. And in this particular – I'm not sure I understood the last part. There was a cause of action for intentional infliction of emotional distress? It wasn't filed, but it was something the trial court in the dissolution of marriage proceeding would need to allocate to one or the other parties, presumably to the wife. Well, but normally, we hear a lot of divorce stuff. Normally, misconduct, even severe misconduct, does not affect to be considered either in the setting of maintenance or in the disposition of property at a time of divorce. But that misses the point. There is an asset called a cause of action that had not yet been filed for the intentional infliction of emotional distress, namely what Tim Little allegedly did to his wife resulting in the severe emotional distress. And if he is convicted in the criminal case, he will be collaterally estopped in a companion civil lawsuit that the trial – the divorce judge will apportion to her. And she could pursue that. It's shooting fish in a barrel at that point in time. He's collaterally estopped to claim he didn't cause her emotional distress because he will be found guilty beyond reasonable doubt. She has financial gain to be had if that divorce goes forward and the judge says, all right, it arose during the marriage. It's a marital asset. You, wife, get that cause of action. That would always be the case, though, any time there is an intentional tort, namely in any kind of beating or case, aggravated battery, battery case, where a victim is testifying as a state's witness in a criminal case, the same argument could always be made that it's conceivable that this victim could bring a civil action. And I was trying to explore that as counsel for my client and bring that back to the jury's attention by cross-examination. It's still some time. But even so, don't you, on this record, wouldn't you have to make an offer of proof that this is something that, in fact, is real as opposed to a theoretical possibility? In other words, that the person you're having cross-examined here, Sarah Little, are you thinking about this? Is this a matter you've considered so that it's more than a flight of fancy that, in fact, there might be some pursuit of civil action? I wanted to pursue that. I couldn't, and I'm not required in a criminal case in cross-examination to make an offer of proof. I cited People Baptiste for that very point in my brief. Counsel cannot often know in advance what pertinent facts may be elicited on cross-examination. For that reason, it's necessarily exploratory, and the rule that the examiner must indicate the purpose of his inquiry does not in general apply, period. Now, that's not correct, Counsel. You're always required to make an offer of proof with regard to evidence that has been barred. You don't have to do it at that moment, but you need to ask the court to make an offer of proof so this court is not required. Well, then I would say to the court, how does it get around the language in People Baptiste that I just quoted? What court wrote that and when? That court decision was from the First District Appellate Court, 37 L.A. 3rd 808. Well, this court has written lots of decisions since then which have been pretty clear that that's not the rule. Well, I've shepherdized it. Well, an offer of proof, People v. Pelo, would be a good one to check out on what an offer of proof requires from this court just two years ago, because we're left with a record that is unclear. We don't know any idea. It might very well have been that if he had asked these questions and offered proof, he said, I don't know anything about it. He's got no money. I'm not interested in that. I've never thought about it. And that would certainly support the trial court's discretionary ruling, which is what it is, on scope of cross-examination. I'm not going to argue with the court anymore. I cited my authority. The state did not have anything to say. Well, I took up some of your time. I'll give you a moment to complete your, okay. I'm finished. I appreciate your attention, Your Honor. Thank you, counsel. So we'll take this matter and advise him to be released.